**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | **CHAPTER 11** |
| | **SUBCHAPTER V** |
| **FANJOY CO.,** | |
| | |
| **Debtor.** | **CASE NO. 23-57565-PWB** |

## PLAN OF REORGANIZATION

**Dated this 6th day of November, 2023**

Filed by:

**Fanjoy Co.**

Attorneys for Debtor
Leslie M. Pineyro, Esq.
Leon S. Jones, Esq.
Mark D. Gensburg, Esq.
Jones & Walden LLC
699 Piedmont Ave NE
Atlanta, Georgia 30308
(404) 564-9300

COMES NOW Fanjoy Co. ("Debtor"), and, pursuant to Sections 1123, 1189, and 1190 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), proposes this Plan of Reorganization (the "Plan") for the resolution of the Claims against Debtor.  Debtor is the proponent of this Plan as required under Section 1191 of the Bankruptcy Code.

## Article 1
## Contents of the Plan; Required Disclosures

1.1    *Subchapter V Plan of Reorganization*. This Plan is filed under Subchapter V of Chapter 11 of the Bankruptcy Code.  To the extent that the Court determines that the Debtor is not eligible for relief under Subchapter V of Chapter 11, Debtor seeks confirmation of this Plan under Bankruptcy Code Section 1129 as a "standard" chapter 11 Debtor.

1.2    *History of the Debtor's Business Operations*.

Debtor is an online company that provides platform and merchandise marketplace services to social media content creators ("Content Creators"). Debtor has been operating since 2014. Debtor's client Content Creators each have anywhere from hundreds of thousands to hundreds of millions of social media "followers" across various social media platforms, including, but not limited to, YouTube, Instagram, Twitch, and TikTok (collectively, their "Followers").

In concert with its client Content Creators, Debtor operates the fanjoy.co website, which provides end-to-end design, production, fulfillment, customer support, e-mail marketing, photoshoots, product shots, and paid advertisement services for its Content Creators (the "Business"). In this manner, Debtor operates as an intermediary between the Content Creators and their Followers.

In 2018, one of Debtor's largest client Content Creators was "cancelled," which caused Debtor to lose a significant percentage of its regular income. This reduction in income created a liquidity crunch and forced Debtor to seek cash in the form of a loan from CircleUp Credit Advisors LLC ("CircleUp") in March of 2022 (the "CircleUp Loan"). On February 10, 2023 Debtor was placed into default by CircleUp for the non-monetary default of incurring additional debt from WebBank (Shopify Capital) ("Shopify").

After being placed into default, payments and interest on the CircleUp Loan increased dramatically. Despite the increased payments, Debtor made default payments on the CircleUp Loan until April of 2023, when CircleUp attempted to withdraw more money from Debtor's operating bank account than was available. CircleUp delivered its second notice of default to Debtor on April 25, 2023.

On May 30, 2023 the Superior Court for the State of California, County of Los Angeles appointed James Wong as receiver (the "Receiver") over Debtor (the "Receivership"). Debtor filed for Chapter 11 bankruptcy on August 8, 2023 (the "Petition Date") with the purpose of reorganizing Debtor's Business for a return to profitability and in an effort to provide an equitable return to all of its creditors.

1.3    *Current Management and Employees*.

### 1.3.1   Directors and Officers of Reorganized Debtor.

73.191% of Debtor's stock is owned by Chris Vaccarino ("Mr. Vaccarino") who also serves as Debtor's Founder, Chief Executive Officer, President, and Sole Director.

#### *1.3.1.1* Insiders Employed by Reorganized Debtor.

Mr. Vaccarino is employed fulltime by Debtor with a salary of $228,307.72 per year. Cristina Mano is a relative of Mr. Vaccarino with a salary of $63,726.99. Carissa Vaccarino is a relative of Mr. Vaccarino with a salary of $65,750.00 per year. Finally, Susan Vaccarino is a relative of Mr. Vaccarino with a salary of $65,750.00 per year.

1.4 *Liquidation Analysis.*

Holders of claims would not receive any greater return in a liquidation of Debtor's assets. Moreover, in liquidation, a bankruptcy trustee would incur costs associated with liquidation such as broker fees.  Conversion and liquidation under Chapter 7 of the Bankruptcy Code would result in the appointment of a Chapter 7 trustee and the liquidation of assets. Assets disposed of by "liquidation" or "fire" sale generally generate significantly less proceeds than assets that are marketed and sold as a going concern.  Debtor's assets are fully encumbered by the claim of CircleUp and, therefore, in a hypothetical liquidation there would be no distribution to any creditor apart from CircleUp. Additionally, a Subchapter V trustee or Chapter 7 trustee would incur trustee's fees pursuant to Section 326(a) or Section 330 of the Bankruptcy Code.[1]

1.5    *Alternative Confirmation Standards Under Section 1191(a) and (b):*

1.5.A *If Debtor proceeds under Subchapter V:* Debtor seeks to confirm this Plan by obtaining the consent of all Impaired Classes provided for in this Plan by a majority in number and two-thirds in amount of Allowed Claims actually voting. If Debtor succeeds in obtaining the accepting vote (i.e. consent) of all Impaired Classes, the provisions of the Plan referencing and

---

[1] 11 U.S.C. § 326(a) states that a Chapter 7 trustee would incur trustee's fees equal to 25% of the first $5,000 of Liquidation Value of Assets; 10% of amount in excess of $5,000 but not in excess of $50,000 of Liquidation Value of Assets; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; 3% of any amount in excess of $1,000,000 of the Liquidation Value of Asset. Commissions for auctioneers or brokers for personal property and commercial real estate generally are generally equivalent to ten (10%) percent of the gross sales price.  In addition, the attorney and any other professional for the Chapter 7 trustee would incur attorney's fees and other fees.

11 U.S.C. § 330 provides for reasonable compensation for actual, necessary services rendered by the Subchapter V trustee and reimbursement for actual, necessary expenses. The Subchapter V trustee's hourly rate is $400.00.

operating under Section 1191(a) of the Bankruptcy Code will apply as described herein. If Debtor is unable to obtain the accepting vote (i.e. consent) of all Impaired Classes and is seeking confirmation of this Plan as a subchapter V Debtor, Debtor will request the Court to confirm the Plan under Section 1191(b) and the provisions of the Plan referencing and operating under Section 1191(b) of the Bankruptcy Code will apply as described herein.

1.5.B. *If Debtor does not proceed under Subchapter V*: If the Court determines that Debtor is ineligible as a subchapter V debtor, then the Debtor will seek confirmation of this Plan under the provisions of Chapter 11 which apply to "standard" chapter 11 cases and request the Court waive the requirement for a separate disclosure statement and finding that the Plan itself substantially complies with § 1125 by containing adequate information. With respect to Chapter 11 Debtors that are not proceeding under subchapter V, the Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all Impaired classes. To confirm the Plan without the requisite number of acceptances of each Impaired Class, the Court must find that at least one Impaired Class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable to, any Impaired Class that does not accept the Plan.  Accordingly, if any Impaired Class does not vote to accept the Plan, Debtor will seek to confirm the Plan under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

1.6     *Property and Claims.*  This Plan deals with all property of Debtor and provides for treatment of all Claims against Debtor and its property.

**Article 2**
**Definitions and General Provisions**

For the purposes of this Plan, except as otherwise expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article of the Plan.  Any term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term therein.

2.1     *Definitions.* The following terms, when used in this Plan, shall have the following meaning:

2.1.1 "*Administrative Expense Claim*" means a Claim for payment of an administrative expense entitled to priority under Section 507(a)(2) of the Bankruptcy Code.

2.1.2 "*Allowed Administrative Expense Claim*" means an Administrative Expense Claim that has been allowed pursuant to a Final Order in accordance with Article 6.3 of this Plan.

2.1.3   "*Allowed Claim*" shall mean a Claim or any portion thereof that is enforceable against Debtor or enforceable against the property of Debtor under Sections 502 or 503 of the Bankruptcy Code.

2.1.4   "*Allowed Secured Claim*" shall mean the amount of the allowed Claim held by parties secured by property of Debtor which is equal to the amount provided by the Plan unless

4

such other amount is stipulated as constituting the allowed secured claim between the parties, or such amount as the Bankruptcy Court allows.

2.1.5    "*Allowed Unsecured Claim*" shall mean Allowed Claims which are not allowed administrative, priority, or secured claims.

2.1.6    "*Assets*" means, collectively, all of the property, as defined by Section 541 of the Bankruptcy Code, of the Estate of Debtor (including without limitation, all of the assets, property, interests (including equity interests) and effects, real and personal, tangible and intangible, including all Avoidance Actions), wherever situated as such properties exist on the Effective Date or thereafter.

2.1.7    "*Avoidance Action*" means any claim or cause of action of the Estate arising out of or maintainable pursuant to Sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or any other similar applicable law or section of the Bankruptcy Code, regardless of whether such action has been commenced prior to the Effective Date.

2.1.8    "*Ballot*" means each of the ballot forms that are distributed with the Plan to Holders of Claims included in the Classes that are Impaired under this Plan and are entitled to vote.

2.1.9    "*Bankruptcy Case*" means the Chapter 11 case initiated by Debtor's filing on the Filing Date of a voluntary petition for relief in the Bankruptcy Court under Subchapter V of Chapter 11 of the Bankruptcy Code.

2.1.10   "*Bankruptcy Code*" means Title 11 of the United States Code.

2.1.11   "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

2.1.12   "*Bankruptcy Rules*" means, collectively, the Federal Rules of Bankruptcy Procedure.

2.1.13   "*Bar Date"* means October 17, 2023, the date the Court established as the deadline for nongovernmental entities to file a proof of claim pursuant to docket entry number 12 (the "Bar Notice"). The terms of the Bar Notice will continue in full effect after the Effective Date.

2.1.14   "*Bar Notice*" shall have the meaning as defined in 2.1.13 herein.

2.1.15   "*Business Day*" means any day on which the commercial banks are required to be open for business in Atlanta, Georgia and which is not a weekend or legal holiday recognized by the Bankruptcy Court or the Superior Courts of the State of Georgia.

2.1.16   "*Cash*" means legal tender of the United States of America and equivalents thereof.

2.1.17 "*Causes of Action*" means all Avoidance Actions and any and all of Debtor's actions, suits, accounts, agreements, promises, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise.

2.1.18 "*Chapter 11*" means Chapter 11 of the Bankruptcy Code.

2.1.19 "*Claim*" means a claim against Debtor whether or not asserted, as defined in Section 101(5) of the Bankruptcy Code.

2.1.20 "*Classes*" means a category of Claims described in this Plan.

2.1.21 "*Cure Amount*" means the amount in Cash necessary to satisfy the requirements to cure a default pursuant to 11 U.S.C. § 365 for assumption of an executory contract or unexpired lease.

2.1.22 "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order.

2.1.23 "*Confirmation Hearing*" means the hearing before the Bankruptcy Court held to consider confirmation of this Plan and related matters under Section 1191 of the Bankruptcy Code, or under Bankruptcy Code Section 1129 if Debtor is determined to be ineligible under Subchapter V, as such hearing may be continued.

2.1.24 "*Confirmation Order*" means the order confirming this Plan pursuant to Section 1191 of the Bankruptcy Code (or under Section 1129 if Debtor is determined to be ineligible under subchapter V) that the Bankruptcy Court enters, which shall be in all respects reasonably acceptable to Debtor.

2.1.25 "*Debtor*" means Fanjoy Co., the debtor in this Bankruptcy Case.

2.1.26 "*Disallowed Claim*" means a Claim or any portion thereof that: (i) has been disallowed by a Final Order, (ii) is listed in any of Debtor' Schedules at zero, unknown, contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court, or (iii) is not listed in Debtor' Schedules and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court.

2.1.27 "*Disputed Claim*" means, with reference to any Claim, a Claim or any portion thereof, that is the subject of an objection timely filed in the Bankruptcy Court and which objection has not been withdrawn, settled or overruled by a Final Order of the Bankruptcy Court.

2.1.28 "*Distribution*" means any distribution by Debtor or reorganized Debtor to a Holder of an Allowed Claim.

2.1.29 "*District Court*" means the United States District Court for the Northern District of Georgia, Atlanta Division.

2.1.30 "*Effective Date*" means May 1, 2023.

2.1.31 "*Estate*" means, with regard to Debtor, the estate that was created by the commencement by Debtor of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges of such Debtor and any and all interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the commencement of the Bankruptcy Case whether by virtue of Sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise. In the event that this Plan is confirmed by the Bankruptcy Court under Section 1191(b) of the Bankruptcy Code, such definition shall also include (1) all of the property defined by Section 541 of the Bankruptcy Code and (2) any earnings from services performed by the Debtor after the commencement of the Bankruptcy Case but before the Bankruptcy Case is closed, dismissed, or converted to a case under Chapter 7,, whichever occurs first.

2.1.32 "*Executory Contract or Unexpired Lease*" means all executory contracts and unexpired leases to which Debtor is a party.

2.1.33 "*Filing Date*" or "*Petition Date*" means August 8, 2023.

2.1.34 "*Final Distribution*" means the Distribution by Debtor or reorganized Debtor that satisfies all Allowed Claims to the extent provided in accordance with the Plan.

2.1.35 "*Final Distribution Date*" means the Distribution Date on which the Final Distribution is made.

2.1.36 "*Final Order*" means an order of the Bankruptcy Court, the District Court, or any other court as to which (i) any appeal that has been taken has been finally determined or dismissed, or (ii) the time for appeal has expired and no appeal has been filed timely.  In the case of an order of the Bankruptcy Court, the time for appeal, for purposes of this definition, shall be the time permitted for an appeal to the District Court.

2.1.37 "*Government Bar Date*" in accordance with 11 U.S.C. § 502, is 180 days after the order for relief (here the Filing Date) and means February 4, 2024.

2.1.38 "*Holder*" means a holder of a Claim or Interest, as applicable.

2.1.39 "*Impaired*" shall have the meaning ascribed thereto in Section 1124 of the Bankruptcy Code.

2.1.40 "*Initial Distribution Date*" means the Effective Date.

2.1.41 "*Lien*" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

7

2.1.42 "*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in Section 101(27) of the Bankruptcy Code) or other entity.

2.1.43 "*Plan*" means this plan of reorganization as it may hereafter be corrected, amended, supplemented, restated, or modified.

2.1.44 "*Priority Claim*" means a Claim entitled to priority under the provisions of Section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

2.1.45 "*Priority Tax Claim*" means a Claim against Debtor that is of a kind specified in Sections 507(a)(8) of the Bankruptcy Code.

2.1.46 "*Professional Compensation*" means (1) any amounts that the Bankruptcy Court allows pursuant to Section 330 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by professionals employed by Debtor and the fees and expenses of the Subchapter V Trustee, and (2) any amounts the Bankruptcy Court allows pursuant to Sections 503(b)(3) and (4) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Case.

2.1.47 "*Record Date*" means any date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of holders of Allowed Claims entitled to Distributions under this Plan.  If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court prior to the Confirmation Date, then the Record Date shall be the Confirmation Date.

2.1.48 "*Record Holder*" means the Holder of a Claim as of the Record Date.

2.1.49 "*Released Parties*" means Debtor.

2.1.50 "*Retained Action*" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which Debtor or Debtor's Estate may hold against any Person, including, without limitation, (i) claims and Causes of Action brought prior to the Effective Date, (ii) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by Debtor, (iii) claims and Causes of Action relating to strict enforcement of Debtor's intellectual property rights, including patents, copyrights and trademarks, (iv) claims and Causes of Action seeking the recovery of Debtor's accounts receivable or other receivables or rights to payment created or arising in the ordinary course of Debtor' business, including without limitation, claims for overpayments and tax refunds, (v) all Causes of Action that are Avoidance Actions; and (vi) all those claims or causes of action described in Section 7.3 Preservation of Causes of Action.

2.1.51 "*Schedules*" means the Schedules of Assets and Liabilities Debtor filed in the Bankruptcy Case, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

2.1.52 "*Secured Claim*" means a Claim against Debtor to the extent secured by a Lien on any property of Debtor on the Petition Date to the extent of the value of said property as provided in the Plan.

2.1.53 "*Subchapter V Trustee*" means Tamara Miles Ogier who was appointed by the United States Trustee under Section 1183(a) of the Bankruptcy Code to serve as the Subchapter V trustee in this Bankruptcy Case, and any successor trustee to Ms. Ogier.

2.1.54 "*Subordinated Claim*" means any Unsecured Claim that is subordinated in priority to all other Allowed Unsecured Claims pursuant to the provisions of Section 510 of the Bankruptcy Code or other applicable law.

2.1.55 "*Unimpaired*" means, with respect to a Class of Claims or Interests, any Class that is not Impaired.

2.1.56 "*Unsecured Claim*" means any Claim against Debtor that is not a Secured Claim, a Priority Claim, a Priority Tax Claim, or an Administrative Expense Claim.

2.2    *Time*.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Georgia, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.

2.3    *Events of Default*.    Unless otherwise specifically provided in a class under the Plan, in the event of a default by Debtor in payments or otherwise pursuant to the Plan, the Holder must send written notice (the "Default Notice") to Debtor at the addresses of record for Debtor as reflected on the docket for this Bankruptcy Case, unless Debtor has provided the Holder with a written notice of a change of address.  Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Debtor has ten (10) days (in the case of a payment default) and thirty (30) days (in the case of a default other than a payment) from receipt by Debtor and Debtor's counsel of the Default Notice (or the following business day if the 10th or 30th day does not fall on a business day) to cure such default (and the address for payment, which will accept overnight deliveries, in the event of a payment default). The Holder must send such Default Notice to (a) Debtor via certified mail or recognized overnight carrier, and (b) by certified mail or recognized overnight carrier to Leslie M. Pineyro and Leon S. Jones (Jones & Walden, LLC) at the address reflected in the then current directory of the State of Bar of Georgia with a copy via email. Debtor shall have ten (10) days or thirty (30) days (as applicable) from Debtor's and Debtor's counsel's receipt of the Default Notice to cure such default. Receipt by Debtor's attorney shall not be deemed receipt by Debtor of the required Default Notice. Notwithstanding anything to the contrary in the

Plan or otherwise, a default under one Class of Claims or sub-class of Claims shall not constitute a default under any other Class of Claims or sub-class of Claims. (For example, a default under Class 1 shall not constitute a default under Class 2). In the event of a default under the Plan as to any creditor or creditors and Debtor's cure of any such default, then the terms of the Plan shall remain in effect and Debtor shall then be deemed to be in compliance with the Plan and the injunction (or automatic stay, as applicable) as to such creditor or creditors shall be and remain unaffected without further order, action or notice, and without limitation, such creditor or creditors shall be enjoined from taking any actions prohibited by the terms of the Plan (including without limitation Article 11.5 of the Plan).

2.3.1   *Remedies in the Event of Default.* In the event of an uncured default, then such affected creditor may take any action provided for by law to enforce the terms of the Plan, but the injunction of the Plan (or automatic stay, as applicable) shall remain in place to prohibit any action other than to enforce the terms of the Plan. Without limitation, a secured creditor may enforce any lien provided under this plan and an unsecured creditor may file an action for breach of contract to enforce any amounts due under the Plan.

2.4   *Notices.*   All notices under the Plan shall be in writing. Unless otherwise specifically provided herein, all notices shall be sent to Debtor via U.S. Certified Mail Return Receipt or by recognized overnight carrier to the address of record for Debtor in this Case, unless Debtor has provided such Holder with written notice of change of address for Debtor, with a copy via email and certified mail or nationally recognized overnight delivery service to Leslie M. Pineyro and Leon Jones at the address reflected in the then current directory of the State Bar of Georgia. Receipt of notice by Leslie M. Pineyro and Leon Jones (Jones & Walden, LLC) shall not be deemed receipt by Debtor of the required notice. Notice to creditors may be provided (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records.

**Article 3**
**Classification of Claims and Interests**

3.1   *Summary.*  The categories of Claims and Interests set forth below classify all Claims against Debtor for all purposes of this Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  The treatment with respect to each Class of Claims and Interests provided for in Article 4 shall be in full and complete satisfaction, release, and discharge of such Claims and Interests.

3.2    Classes:

    3.2.1    Class 1 consists of the Secured or Priority Tax Claim of the Internal Revenue Service.

    3.2.2    Class 2 consists of the Secured or Priority Tax Claim of the Georgia Department of Revenue.

    3.2.3    Class 3 consists of the Priority or Secured Tax Claims of Governmental Units Not Otherwise Classified.

    3.2.4    Class 4 consists of the Secured Claim of CircleUp.

    3.2.5    Class 5 consists of Secured Claims not otherwise classified.

    3.2.6    Class 6 consists of Assumed Content Creator Cure Amount Claims.

    3.2.7    Class 7 consists of the Cure Amount Claim and Secured Claim of ShipMonk.

    3.2.8    Class 8 consists of General Unsecured Claims.

    3.2.9    Class 9 consists of the Equity Interest.

**Article 4**
**Treatment of Claims and Interests**

The Classes, the treatment of each Class, and the voting rights of each Class are set forth below.

Debtor reserves the right to pay any claim in full at any time in accordance with Debtor's obligation to such Holder under the Plan (i.e., at the percentage distribution designated in the Plan and including any accrued and unpaid interest due under the Plan, if any) without prepayment penalty.

Upon request by Debtor, a Holder of a Claim shall provide the then outstanding amount of distributions still due or coming due on the Claim pursuant to the Plan and an accounting of all payments received and their application since the Petition Date.

Notwithstanding anything elsewhere in the Plan, the Bar Notice and Government Bar Date shall continue in full force and effect following confirmation of the Plan.

Nothing herein shall be deemed an admission as to the nature, validity, or amount of any claim. Debtor reserves the right to object to any and all claims whether described in the Plan or not.

**4.1**    **Class 1:  Secured or Priority Tax Claims of the Internal Revenue Service**

Class 1 consists of any priority or secured tax claim of the Internal Revenue Service ("IRS"). Any claim of the IRS for penalties or that is otherwise an unsecured claim shall be classified and treated as a Class 8 General Unsecured Claim. Debtor is not aware of any claim held by the IRS. However, in the event the Court determines the IRS holds an Allowed Class 1 IRS Tax Claim for secured or priority taxes, Debtor shall pay such Allowed Class 1 IRS Tax Claim in full in equal monthly payments commencing on the Effective Date and continuing by the 28th day of each subsequent month (or the next Business Day if the 28th day is not a Business Day) and continuing through the 28th day of the 60th month following the Filing Date with interest accruing at the annual rate required pursuant 11 U.S.C. § 511 on the Confirmation Date unless the IRS agrees to a lower interest rate or longer payment term.  Any third-party payments or payments in excess of the scheduled distribution pursuant to Class 1 received by IRS after the Filing Date shall be applied to the principal tax obligation owed by Debtor pursuant to Class 1.  Notwithstanding anything to the contrary herein, Debtor shall pay the full amount of the Allowed Class 1 IRS Tax Claim within 60 months of the Filing Date unless the IRS agrees to a longer payment term before or after confirmation of the Plan.

A failure by the Debtor to make a payment under Class 1 to the IRS pursuant to the terms of the Plan shall be an event of default as to the IRS' Class 1 Claim.  In the event of a default under Class 1, the IRS must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is a payment default, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries.  Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice.  In the event of an uncured default in payments under Class 1 to the IRS and following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the IRS may (a) enforce the entire amount of its then outstanding Allowed Class 1 IRS Priority Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 1 IRS Priority Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of the IRS that is not assessable prior to the Filing Date or treated as arising before the Filing Date pursuant to 11 U.SC. §502(i), and the right of the IRS, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the IRS would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. However, the rights and treatment of the IRS and obligations and liability of Debtor or its property regarding any claim of the IRS against Debtor which was assessable prior to the Filing Date shall be treated and fixed in accordance with the Plan, and any additional or other claims assessable on or prior to the Filing Date or treated as arising before the Filing Date pursuant to 11 U.SC. §502(i), and not timely asserted by the IRS in accordance with the Bankruptcy Code and the Plan and in all instances prior to entry of the Confirmation Order, shall be forever barred.  Debtor reserves the right to pay any tax claim in full at any time.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims in the Bankruptcy Court or any appropriate tribunal or court.

**4.2**     **Class 2:  Secured or Priority Tax Claims of the Georgia Department of Revenue**

Class 2 consists of any priority or secured tax claim of the Georgia Department of Revenue ("GDR"). Any claim of the GDR for penalties or that is otherwise an unsecured claim shall be classified and treated as a Class 8 General Unsecured Claim. Debtor is not aware of any claim held by the GDR.  However, in the event the Court determines the GDR holds an Allowed Class 2 GDR Tax Claim for secured or priority taxes, Debtor shall pay such Allowed Class 2 GDR Tax Claim in full in 36 equal monthly payments commencing on the Effective Date and continuing by the 28th day of each subsequent month (or the next Business Day if the 28th day is not a Business Day) and continuing through the 28th day of the 60th month following the Filing Date with interest accruing at the annual rate required pursuant 11 U.S.C. § 511 on the Confirmation Date unless the GDR agrees to a lower interest rate or longer payment term.  Any third-party payments or payments in excess of the scheduled distribution pursuant to Class 2 received by GDR after the Filing Date shall be applied to the principal tax obligation owed by Debtor pursuant to Class 2. Notwithstanding anything to the contrary herein, Debtor shall pay the full amount of the Allowed Class 2 GDR Tax Claim within 60 months of the Filing Date unless the GDR agrees to a longer payment term before or after confirmation of the Plan.

A failure by the Debtor to make a payment under Class 2 to the GDR pursuant to the terms of the Plan shall be an event of default as to the GDR's Class 2 Claim.  In the event of a default under Class 2, the GDR must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is a payment default, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries.  Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice.  In the event of an uncured default following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the GDR may (a) enforce the entire amount of its then outstanding Allowed Class 2 GDR Priority Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 2 GDR Priority Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of GDR that is not assessable prior to the Filing Date or treated as arising before the Filing Date pursuant to 11 U.SC. §502(i), and the right of GDR, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of GDR would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. However, the rights and treatment of GDR and obligations and liability of Debtor or its property regarding any claim of GDR against Debtor which was assessable prior to the Filing Date shall be treated and fixed in accordance with the Plan, and any additional or other claims assessable on or prior to the Filing Date or treated as arising before the Filing Date pursuant to 11 U.SC. §502(i),

13

and not timely asserted by GDR in accordance with the Bankruptcy Code and the Plan and in all instances prior to entry of the Confirmation Order, shall be forever barred. Debtor reserves the right to pay any tax claim in full at any time.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims in the Bankruptcy Court or any appropriate tribunal or court.

**4.3    Class 3:    Priority or Secured Tax Claims of Governmental Units Not Otherwise Classified**

Class 3 consists of any Priority or Secured Claim of a governmental unit entitled to priority under 11 U.S.C. § 507(a)(8), which are not otherwise specifically classified in the Plan ("Class 3 Governmental Unit Claim"). The amount of any claim of a Governmental Unit that is not assessed or assessable on or prior to the Effective Date, and the right of the particular governmental unit, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the particular governmental unit would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1192 or 1141 (as applicable) of the Bankruptcy Code if applicable.

Debtor shall pay such Allowed Class 3 Government Unit Priority Tax as provided in the Plan Payment Procedures in Section 4.10 of the Plan with interest accruing at the rate required by 11 U.S.C. § 511 provided, however, that any Allowed Class 3 Governmental Unit Claim that has not been paid in full on or before the 5th anniversary of the Filing Date shall be paid with a final balloon payment on the 5th anniversary of the Filing Date (i.e. August 8, 2028) unless such Holder agrees to a longer payment term before or after the entry of the Confirmation Order. Debtor reserves the right to pay any Class 3 Governmental Unit Claim in full at any time.

On October 18, 2023, the Texas Comptroller of Public Accounts ("Texas Comptroller") on behalf of the state of Texas and Local Sales Tax Jurisdiction filed proof of claim 25 asserting a claim in the total amount of $443,167.25 based on estimated liabilities including: (a) potential Class 3 priority amount for the period of July 2019 through December 4, 2022 in the estimated amount of $406,756.80 (i.e., estimated gross principal tax of $364,104.28 and estimated interest of $42,652.54) and (ii) potential Class 8 General Unsecured Claim for estimated penalties of $36,410.43. Debtor disputes the asserted claim of the Texas Comptroller in its entirety and reserves the right to object to the same in the Bankruptcy Court or any appropriate tribunal or court. In the event Debtor has objected to the Texas Comptroller's Claim on the Effective Date or otherwise pursuant to a claim objection or procedure authorized under Texas law or otherwise, no distribution shall be made on the Texas Comptroller's Claim during the term of any such dispute.

To the extent any Holder of a Class 3 Governmental Unit Priority Tax Claim asserts a security interest or lien on the Debtor's assets, Debtor's assets are fully secured by the first priority lien of CircleUp as further described in Class 4 of the Plan. Accordingly, no value exists in any of the assets of Debtor to attach to the Class 3 Governmental Unit Claim after the interest or lien of the Class 4 Secured Claim. Accordingly, pursuant to 11 U.S.C. §506(a), the lien of any secured

creditor other than CircleUp shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 4 Secured Claim of CircleUp and any amount for penalty or that is otherwise not a priority claim asserted by a Holder of Class 3 Government Unit Priority Claim shall be treated and classified as Class 8 General Unsecured Claim.

Any third-party payments or payments in excess of the scheduled distribution pursuant to Class 3 received by such holder shall be applied to the principal tax obligation owed by Debtor pursuant to Class 3 to such holder.  Debtor's Class 3 payments shall be applied in the following order: (i) interest accruing on the Class 3 Governmental Unit Priority Tax Claim after the Effective Date under the Plan, (ii) the taxes included in the Class 3 Governmental Unit Priority Tax Claim and (iii) interest and penalties which accrued on the Class 3 Governmental Unit Priority Tax Claim prior to the Effective Date.

The Government Bar Date for filing proofs of claim is fixed by 11 U.S.C. §502 and is February 5, 2024. Upon passage of the Government Bar Date, any claim asserted or assertable by a Holder of a Class 3 Claim on or before the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. §502(i) shall: (i) be time barred and fixed as provided in the Plan, subject to Debtor's right to object to the same and (ii) any other, additional or amended claim assessable on or prior to the Filing Date shall be disallowed in its entirety and forever discharged. Debtor shall pay any claim of a governmental entity assessable, arising prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. §502(i) on the terms herein.  After the Government Bar Date, any estimated claim of a governmental unit shall be capped at (i) if a proof of claim was timely filed, the amount provided in the proof of claim filed by such Holder prior to the Bar date or (ii) if no proof of claim is timely filed, the amount provided in Debtor's schedules unless the Debtor scheduled such amount as unliquidated, contingent or disputed, in which case such amounts will be $0.00.

A failure by the Debtor to make a payment under Class 3 to the Holder of a Class 3 Governmental Unit Tax Claim pursuant to the terms of the Plan shall be an event of default as to such Governmental Unit under Class 3.  In the event of a default under Class 3, the Holder of a Class 3 Governmental Unit Tax Claim must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries. Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice. In the event of an uncured default under Class 3 following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the Holder of a Class 3 Governmental Unit Tax Claim may (a) enforce the entire amount of its then outstanding Allowed Class 3 Governmental Unit Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 3 Governmental Unit Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

Nothing herein shall constitute an admission as to the nature, validity, or amount of any such claim. Debtor reserves the right to object to any and all claims in the Bankruptcy Court or any appropriate tribunal or court.

### 4.4    Class 4:  Secured Claim of CircleUp

Class 4 consists of the Secured Claim of CircleUp. On October 16, 2023, CircleUp filed proof of claim number 21 in the asserted amount of $2,507,034.81 consisting of the following asserted amounts: (i) Principal Balance of $2,275,699.58; (ii) Unpaid Accrued Interest of $143,811.20, and (iii) fees and costs of $87,529.03 (such amount, or such amount as allowed by the Court, the "Total Class 4 Claim"). CircleUp asserts the secured portion of the Total Class 4 Claim is secured by a lien on Debtor's assets as more particularly described in the UCC Initial Filing Number 2022 7548811 filed on September 8, 2022, with the Delaware Department of State and as described in the *Credit and Security Agreement* dated March 15, 2022 (the "CircleUp Loan Agreement"). The secured portion of the Total Class 4 Claim shall be $639,864.64—which is based upon the value of the following assets which are subject to the security interest held by CircleUp: $395,664.64 in cash as of the petition date, $19,200.00 in unfinished inventory as of the petition date, $175,000.00 in an Employee Retention Credit, and $50,000.00 in Debtor's trademarks (the "Class 4 Secured Claim").

Debtor shall pay the Class 4 Secured Claim as follows: Debtor shall commence payments beginning on May 1, 2023 and continue monthly by the 1st day of each subsequent month (or the next Business Day if the 1st day is not a Business Day) for 60 months (the "Class 4 Maturity Date"). The Class 4 Secured Claim shall accrue interest at a rate of 10.5%. The total estimated monthly payment on the Class 4 Secured Claim will therefore be $11,818.74. The unsecured portion of the Total Class 4 Claim (i.e. $2,507,034.81 less the $639,864.64 Class 4 Secured Claim) shall be classified and treated as a Class 8 General Unsecured Claim. Any payments received by CircleUp after the Filing Date but before the Effective Date, including any adequate protection payments, shall be applied to the principal balance of the Class 4 Secured Claim. As of the week hereof, CircleUp has received $90,000.00 in adequate protection payments. Any additional adequate protection payments received by CircleUp will further reduce the principal amount of the Class 4 Secured Claim. The total estimated monthly payments, based on the adequate protection payments made hereof, will be $11,818.74.

The lien of CircleUp shall continue and attach to the same validity and priority as existed on the Filing Date and to the extent of the Class 4 Secured Claim. Upon receipt of payment in full of the Class 4 Secured Claim, CircleUp shall release its liens and file a cancellation of all UCC financing statement and take such other acts as reasonably necessary to evidence the release of its liens and security interests as to its collateral. There shall be no pre-payment penalty. Within 5 days of request by Debtor, CircleUp shall provide a then current payoff of the Class 4 Secured Claim together with an accounting of all debits and credits to the Class 4 Secured Claim since the Filing Date.

Nothing herein shall constitute an admission as to the nature, validity, or amount of the Class 4 Secured Claim.

CircleUp's Class 4 Secured Claim is Impaired under the Plan.

### 4.5     Class 5:  Secured Claims not Otherwise Classified

Class 5 consists of Secured Claims against Debtor and the Estate not otherwise classified herein, including but not limited to, the asserted secured claims listed below ("Class 5 Creditors").

Debtor anticipates and projects but does not warrant the following Holders of Class 5 Claims:

| Anticipated Holders | Scheduled/Filed Proof of Secured Claim |
|---|---|
| eCommerce Funding LLC and Onramp Funds, Inc. (collectively, "OnRamp") | $89,820.42 |
| WebBank (Shopify Capital) | Unknown |
| Fifth Floor Fund 1, LLC | Unknown |
| ClearCo | Unknown |
| Slope | Unknown |
| **Total:** | **$89,820.42** |

The Bar Date has passed and any claim asserted or assertable by the Class 5 Creditors on or before the Filing Date shall: (i) be time barred and fixed as provided in this Plan, subject to Debtor's right to object to the same and (ii) any other, additional or amended claim assessable on or prior to the Filing Date shall be disallowed in its entirety and forever discharged. Debtor's assets are fully secured by the first priority lien of the CircleUp as further described in Class 4 of the Plan.  Accordingly, no value exists in any of the assets of Debtor to attach to the Class 5 Secured Claims after the security interest and lien of the CircleUp Class 4 Secured Claim.  Accordingly, pursuant to 11 U.S.C. §506(a), the lien of any secured creditor other than CircleUp shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 4 Secured Claim of CircleUp. Notwithstanding the foregoing, the Class 4 Secured Claim of CircleUp shall be treated, classified and paid pursuant to Class 4 of the Plan. Moreover, other than OnRamp, the other Class 5 Creditors have not filed any UCC financing statement to protect and preserve any secured claim and therefore are unsecured on that basis as well.

The allowed amount of the Class 5 Secured Claims shall be $0.00 and the Class 5 Secured Claims shall continue and attach to Debtor's assets to the extent of $0.00.  The Class 5 Secured Claims shall be specifically reclassified as and paid pursuant to Class 8 as General Unsecured Claims.

The claims of the Class 5 Creditors are unimpaired by the Plan; however, a holder's Class 8 General Unsecured Claim is impaired and said holder is entitled to vote pursuant to Class 8 of the Plan. *Solow v. PPI Enterprises (U.S.) (In re PPI Enterprises, (U.S.), Inc.)*, 324 F.3d 197 (3d

Cir. 2003) ("[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment, we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights.")

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim (as to Class 5, Class 8, or otherwise). Debtor reserves the right to object to any and all claims.

### 4.6 Class 6: Assumed Content Creator Cure Amount

Class 6 consists of the Cure Amount Claims of Debtor's assumed client social media content creators (the "Content Creators"). Debtor intends to assume the contracts of the Content Creators listed on Exhibits hereto in the Cure Amount listed on said exhibit (such amount, or such amount as allowed by the Court, a "Class 6 Claim"), as more particularly described in **Exhibit "A"** appended hereto.

Debtor will pay each Class 6 Claim in full in 18 equal monthly payments commencing on the Effective Date and continuing by the last business day of each subsequent month for a total of 18 payments. Any payments paid to Class 6 Claim Holders after the Filing Date but before the Effective Date, including any adequate assurance payments, shall be applied to the principal balance of the Class 6 Claim.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves Debtor reserves the right to object to any and all claims.

### 4.7 Class 7: Cure Amount of BedaBox, LLC d/b/a ShipMonk

Class 7 consists of the Cure Amount Claims of Debtor's assumed contract with BedaBox, LLC d/b/a ShipMonk ("ShipMonk"). Debtor intends to assume the contract of ShipMonk in the Cure Amount of $239,254.05 (such amount, or such amount as allowed by the Court, the "Class 7 Claim"). ShipMonk asserts a warehouse lien on Debtor's inventory located at the ShipMonk warehouse. Debtor values ShipMonk's secured claim at $58,000.00. Accordingly, $58,000.00 of ShipMonk's Class 7 Claim shall be secured and interest shall accrue on that secured portion of the Class 7 Claim at a rate of 10.5%.

Debtor will pay the Class 7 Claim in full in 24 equal monthly payments commencing on the Effective Date and continuing by the last business day of each subsequent month for a total of 24 payments. The estimated amount of these monthly payments is $10,242.06 (constituting $7,552.25 in monthly payments on the unsecured portion of the Class 7 Claim plus $2,689.81 on the secured portion of the Class 7 Claim) Any adequate protection payments paid to Class 7 Claim Holders after the Filing Date but before the Effective Date shall be applied to the principal balance of the Class 7 Claim.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves Debtor reserves the right to object to any and all claims.

**4.8**    **Class 8:  General Unsecured Claims**

Class 8 consists of general unsecured claims not otherwise specifically classified in the Plan, including deficiency claims pursuant to 11 U.S.C. § 506 and any Allowed rejection damages ("Class 8 General Unsecured Claims").

Debtor will pay the Holders of Class 8 General Unsecured Claims in accordance with the Plan Payment Procedures set forth in Section 4.10 of the Plan. The Class 8 Claims are Impaired by the Plan and the holders of the Class 8 Claims are entitled to vote to accept or reject the Plan.

Notwithstanding anything else in this Plan to the contrary, any Class 8 Claim shall be reduced by any payment received by the creditor holding such claim from any third party or other obligor and Debtor's obligations hereunder shall be reduced accordingly.

Nothing herein shall constitute an admission as to the nature, validity, or amount of any Class 8 General Unsecured Claim. Debtor reserves the right to object to or seek to subordinate any and all claims.

**4.9**    **Class 9:   Equity Interest Claims**

Class 9 consists of the Equity Interest Claims (i.e., the claim of Debtor's shareholders based upon ownership of Debtor).

*Subchapter-V Treatment*: In the event the Court confirms this Plan under subchapter V, all holders of Equity Interest Claims shall retain their respective ownership stakes in the reorganized Debtor.

Under this treatment, Class 9 Equity Interest Claim Holders are unimpaired and are not entitled to vote.

*Non-Subchapter-V Treatment*: In the event that the Court determines that Debtor is ineligible for relief as a subchapter V debtor, then the following provisions will govern the treatment of the Class 9 Equity Interest Claims. In the event the unsecured creditors vote as a class to accept Debtor's Plan, then all holders of Equity Interest Claims shall retain their respective ownership stakes in the reorganized Debtor. In the event the unsecured creditors do not vote as a class to accept Debtor's Plan and Debtor must satisfy the "absolute priority rule" as incorporated into 1129(b)(2)(B)(ii) (the "Triggering Event"), the membership interest in Debtor shall be cancelled and 100% of such interest (the "New Interest") shall be reissued to the Winning Bidder.  Upon any occurrence of the Triggering Event, Christopher Vaccarino ("Buyer") currently proposes to pay $5,000.00 ("Vaccarino's Initial Bid") for the New Interest.  In such event, any other interested party who desires to submit a bid may do so pursuant to the terms and conditions below:

a.    Qualified Bidder.  A "Qualified Bidder" shall be a person or entity who has delivered a written bid to the counsel for Debtor no later than 5:00 p.m. Eastern Time on the date that is 10 days prior to the Confirmation Hearing.  For avoidance of doubt, Vaccarino shall be

deemed to be a Qualified Bidder and Vaccarino's Initial Bid shall be deemed to be an initial qualified bid.

b.      Qualified Bid Requirements.  Qualified competing bids from a Qualified Bidder: (i) shall be for cash (ii) shall have no contingencies as to payment on the Effective Date (other than entry of a final order approving the Plan); (iii) shall be in an amount equal to or greater than Vaccarino's Initial Bid, plus $5,000.00 (iv) shall contain an acknowledgement that any such purchase of the New Interest is subject to the Plan and the Debtor shall be subject to the Plan upon entry of a Confirmation Order (collectively, a "Qualified Bid").

c.      Auction.  Debtor will, if the Triggering Event occurs and a Qualified Bidder submits a Qualified Bid, make such announcement at the Confirmation Hearing.  In such event, Debtor will conduct an auction (the "Auction") at the Confirmation Hearing.  The New Interest will be auctioned as single lot.  Only Qualified Bidders who have previously submitted a Qualified Bid may participate in the Auction.  Qualified Bidders must participate in person in the Auction at the Confirmation Hearing.  Any Qualified Bidder making a bid at the Auction must provide evidence reasonably satisfactory to Debtor demonstrating the Qualified Bidder's financial ability to close and to consummate an acquisition of the New Interest for the amount of the bid made at the Auction.  Debtor will announce at the commencement of the Auction which Qualified Bid is the highest and best bid for the New Interest.  Qualified Bidders will have an opportunity to increase their bids at the Auction, and successive bids over the last highest and best bid at the Auction must be in increments of at least $5,000.00 for the first such bid and $5,000.00 thereafter.  At the conclusion of the Auction, Debtor shall determine the highest and best bid for the New Interest ("Winning Bidder").  No competing bids or offers shall be entertained by Debtor unless made in compliance with the terms of the bidding procedures approved by the Court.

d.      Approval of Bankruptcy Court. Debtor shall present the highest or best bid to the Bankruptcy Court at the Confirmation Hearing. The closing of the sale to Vaccarino or the successful bidder, as the case may be, shall take place no later than five (5) business days after the Effective Date. The sale conducted pursuant to these bid procedures will be final with payment due in full upon closing via wire transfer or certified funds.   Debtor is providing no warranties expressed or implied, including, without limitation, warranties related to merchantability or fitness for a particular purpose. Accordingly, the successful bidder will accept the New Interest purchased in "as is, where is, with all faults" condition.

Under this treatment, Class 9 Equity Interest Claim Holders are impaired and are entitled to vote.

**4.10    Plan Payment Procedures**

4.10.1    "Creditor Payment" means the projected disposable income after payment of the other class payments set forth on the Budget attached as **Exhibit "B"** (the "Budget") and reservation of necessary cash reserves of Debtor to be received in the five-year period beginning on the date that the first payment is due under this Plan, which will be applied to make payments under the Plan, as more specifically set forth on Exhibit "B" to this Plan in the line item entitled

"Other Creditors." The Creditor Payment shall be fixed based upon the amount set forth on the Budget attached as Exhibit "B" to this Plan.

4.10.2    Debtor shall pay the Creditor Payment in satisfaction of its obligations to: (i) Allowed Administrative Expense Claims, (ii) Allowed Priority Claims and (ii) Class 8 General Unsecured Claims. The Allowed Secured Claim of the CircleUp, as set forth in Class 4 of the Plan, shall be paid pursuant to the provisions of Class 4 and the CircleUp will not share in the Creditor Payment except to the extent of the unsecured portion of the Total Class 4 claim.

4.10.3    Debtor shall pay the Creditor Payment commencing on May 1, 2024 and continuing by the last day of each subsequent month (or the next Business Day if the last day of the month is not a Business Day) and continuing until the later of (i) the payment in full of all Allowed Administrative and Allowed Priority Claims and (ii) payment of the total amount of the budgeted Creditor Payments that are budgeted through and including May 1, 2029 (the "Creditor Payments Term").

4.10.4    Creditor Payments will be disbursed as follows:

(i)      Creditor Payments shall be distributed first to accrued unpaid Allowed Administrative Expenses including Allowed Professional Fees.

(ii)     Then, after payment in full of the Class 7 and Class 8 Allowed Unsecured Claims as set forth in the preceding paragraph, the Creditor Payments will be retained by the reorganized Debtor.

## Article 5
## Subchapter V Trustee

5.1    *Subchapter V Trustee.*

The Subchapter V Trustee was appointed by the United States Trustee in this case to perform the duties described in Section 1183(b) of the Bankruptcy Code, one of which is to facilitate the development of a consensual plan of reorganization.

5.2    *Termination of the Subchapter V Trustee's Services.*

The services of the Subchapter V Trustee shall terminate upon "substantial consummation" of the Plan, as defined in Section 1101(2) of the Bankruptcy Code. Debtor shall directly make all payments required under this Plan, including the first payments required for substantial consummation of the Plan.

5.3     *Compensation of the Subchapter V Trustee.*

The Subchapter V Trustee shall be entitled to apply for reasonable compensation for the Subchapter V Trustee's fees and expenses under 11 U.S.C. §§ 330 and 503(b)(3) periodically following confirmation of the Plan in accordance with the Plan.

In the event Debtor is determined to be eligible as a subchapter V debtor, and the Plan is confirmed under Bankruptcy Code Section 1191, then Debtor shall pay all compensation awarded the Subchapter V Trustee: (i) on the later of (a) the Effective Date, and (b) 15 days after entry of a Final Order approving the Subchapter V Trustee's fees, if confirmation is consensual; and (ii) in accordance with the Plan Payment Procedures in Section 4.10 of this Plan if confirmation is by cramdown. In the event Debtor is determined to be ineligible as a subchapter V debtor, and the Plan is confirmed under Bankruptcy Code Section 1129, then Debtor shall pay all compensation awarded the Subchapter V Trustee: (i) on the later of (a) the Effective Date, and (b) 15 days after entry of a Final Order approving the Subchapter V Trustee's fees, if confirmation is consensual; and (ii) in accordance with the Plan Payment Procedures in Section 4.10 of this Plan if confirmation is by cramdown.

## Article 6
## Treatment of Unclassified Claims

6.1     *Summary*.  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Expense Claims against Debtor are not classified for purposes of voting on the Plan.  Holders of such Claims are not entitled to vote on the Plan.  All such Claims are instead treated separately in accordance with Article 6 of the Plan and in accordance with the requirements set forth in Sections 1129(a)(9)(A) and 1191(e) of the Bankruptcy Code, as applicable, and as described in the Plan Payment Procedures in Section 4.10 of this Plan.

6.2     *Jones & Walden LLC.*  With respect to potential Administrative Expense Claims, Debtor, pursuant to Court order, retained the law firm of Jones & Walden LLC ("Firm") to serve as bankruptcy counsel.  As set forth in the employment application and supporting documents, the Firm received a prepetition retainer in the amount of $28,414.50. The Firm's fees have exceeded the retainer.  Debtor shall pay any unpaid Allowed Administrative Expense Claim held by the Firm as of the Confirmation Date in accordance with the Plan Payment Procedures in Section 4.10 of this Plan. The Firm shall retain its lien upon the pre-petition retainer. Any remedy that is set forth in the Plan related to the Allowed Administrative Expense Claims of the Firm is not exclusive of any other remedies that are provided for herein or by law and the Firm may commence an action to enforce the same. Any claim of Jones & Walden LLC for professional fees and expenses associated with this Bankruptcy Case shall not be discharged pursuant to this Plan and nothing herein shall require Jones & Walden LLC to forbear from or otherwise delay in enforcing its rights and remedies under law or equity regarding the same, including without limitation filing an

attorney lien in accordance with O.C.G.A. § 15-19-14 or otherwise.

6.3     *Allowed Administrative Expense Claims.*  Subject to the provisions of Sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Expense Claim

(unless otherwise provided by the Plan) will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash pursuant to Section 4.9 of this Plan. Allowed Administrative Expense Claims representing obligations incurred by Debtor in the ordinary course of business after the Filing Date will be paid or performed by Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations. Debtor is paying post-petition bills and does not expect any claims for unpaid post-petition goods and services other than possible professional fees.

6.4     *Application for an Allowed Administrative Expense Claim.* Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim shall file an application for allowance of such Administrative Expense Claim with the Bankruptcy Court within thirty (30) days after the Confirmation Date.  At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the application for Administrative Expense Claim upon counsel for Debtor and the Subchapter V Trustee.  Any Person who fails to timely file and serve an application for allowance of an Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claims by Debtor or the Estate.

6.5     *Professional Fees.* Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Confirmation Date or by such other deadline as may be fixed by the Bankruptcy Court prior to such deadline.

6.6     *Post-Confirmation Professional Fees.* Debtor may pay professional fees incurred after confirmation of the Plan without Court approval, other than the fees of the Subchapter V Trustee, which must be approved by the Court.

**Article 7**
**Means for the Implementation of the Plan**

7.1     *Parties Responsible for Implementation of the Plan.*  Upon confirmation, Debtor will be charged with administration of the Case.  Debtor will be authorized and empowered to take such actions as are required to effectuate the Plan. Debtor will file all post-confirmation reports required by the Bankruptcy Code and Bankruptcy Rules. Debtor will also file the necessary final reports and may apply for a final decree after substantial consummation at such time as debtor deems appropriate unless otherwise required by the Bankruptcy Court. Debtor shall be authorized to reopen this case after the entry of a Final Decree to enforce the terms of the Plan including for the purpose of seeking to hold a party in contempt or to enforce the confirmation or discharge injunction or otherwise afford relief to Debtor and Debtor may request that the fee associated with such motion to reopen Debtor's case be waived.

7.2     *Sources of Cash for Distribution.*

7.2.1     The source of funds for the payments pursuant to the Plan is Debtor's continued operations.

7.2.2          A copy of Debtor's post Confirmation monthly projections is set forth on Exhibit "B" to this Plan. Debtor's projections are based on Debtor's post-petition operations and expected future operations. Debtor is able to reasonably project income and expenses based on such information. To the extent that Debtor's gross revenue varies from the projected gross revenue, Debtor anticipates a corresponding and proportional change in Debtor's expenses such that Debtor will be able to maintain all Distributions under this Plan.

7.2.3          Debtor may maintain bank accounts under the confirmed Plan in the ordinary course of business. Debtor may also pay ordinary and necessary expenses of administration of the Plan in due course.

7.3     *Preservation of Causes of Action*.  In accordance with section 1123(b)(3) of the Bankruptcy Code, Debtor will retain and may (but is not required to) enforce all Retained Actions. After the Effective Date, Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  Debtor (or any successors, in the exercise of their sole discretion), may pursue such Retained Actions so long as it is the best interests of Debtor (or any successors holding such rights of action). The failure of Debtor to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by Debtor of such claim, right of action, suit, proceeding or other Retained Action, and Debtor will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in Debtor's sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Retained Actions upon or after the confirmation or consummation of this Plan. Debtor reserves all causes of actions for breach of any former or now existing agreement or otherwise.  Debtor specifically reserves any cause of action against any of Debtor's account debtors related to underpayment or non-payment of any fees, or other monies or receivables due. The Plan shall not be deemed a waiver of any right of Debtor to collect any receivable or right to payment under any applicable laws. Debtor expressly reserves the right to exercise any and all remedies available to Debtor regarding its accounts receivable or rights to payment at law or in equity, at such time or times as Debtor from time to time may elect. This Plan is filed with a full reservation of rights. Any failure by Debtor to assert or set forth the occurrence of any other default or events of default which may have occurred shall not be deemed to be a waiver, release or estoppel of such other default or event of default.  Debtor hereby expressly reserves the right to declare any such other default or event of default and to take such other action as Debtor may be entitled to applicable law. No delay on the part of Debtor in exercising any right or remedy shall operate as a waiver in whole or in part of any right or remedy. Without waiver of the generality of the forgoing, Debtor specifically retains and does not waive any rights, claims, defenses and objections to any tax claim, including without limitation regarding any audit whether commenced before or after the Confirmation Date.

7.4     *Effectuating Documents, Further Transactions*.  Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such action as may be necessary, desirable or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.

7.5 *Exemption from Certain Transfer Taxes and Recording Fees*. Pursuant to 11 U.S.C. § 1146(a), O.C.G.A. § 48-6-65(a)(2), Ga. Comp. R. & Regs. R. 560-11-8.14 and any other applicable laws, codes or regulations, any transfers from Debtor to any other Person or entity pursuant to or in contemplation of this Plan, or any agreement regarding the transfer of title to or ownership of any of Debtor's real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment. Without limitation of the foregoing, the Confirmation Order may direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

7.6 *Further Authorization*. Debtor shall be entitled to seek such orders, judgments, injunctions and rulings as it deems necessary or desirable to carry out the intentions and purposes of, and to give full effect to the provisions of, this Plan.

7.7 *Liabilities of Debtor*. Debtor will not have any liabilities except those expressly stated or assumed under the Plan. Debtor will be responsible for all expenses incurred by Debtor in the ordinary course of business after the Filing Date, and those expenses will be paid in the ordinary course of business as they become due or as agreed upon by holders of the expense claim.

## Article 8
## Distributions

8.1 *Disbursing Agent*. Unless otherwise provided for herein, all Distributions under this Plan shall be made by Debtor or its agent.

8.2 *Distributions of Cash*. Any Distribution of Cash made by Debtor pursuant to this Plan shall, at Debtor's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank or in any other form of cash or cash equivalent.

8.3 *No Interest, Fees, Costs or Attorney Fees on Claims or Interests*. Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Holder, postpetition interest, fees, costs or attorney fees shall not accrue or be paid on Claims, and no Holder shall be entitled to interest, fees, costs or attorney fees accruing on or after the Filing Date through and including the Effective Date on any Claim or after the Effective Date unless specifically provided for in the Plan. Additionally, and without limiting the foregoing, interest, fees, costs and attorney fees shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final determination is made when and if such Disputed Claim becomes an Allowed Claim. The provisions of the section of the Plan shall include and pertain to, without limitation, any such claim for post-petition interest, fees, costs or attorney fees pursuant to 11 U.S.C. §§ 503, 506 or 507 if no such claim was allowed prior to the Confirmation Date.

8.4    *Delivery of Distributions*.  The Distribution to a Holder of an Allowed Claim shall be made by Debtor (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until Debtor is notified by such Holder in writing of such Holder's then-current address, at which time Debtor shall recommence Distributions to such Holder without interest but further provided that (i) any distributions not claimed within 6 months of return shall be irrevocably retained by Debtor and (ii) such Holder shall waive its right to such Distributions. All Distributions returned to Debtor and not claimed within six (6) months of return shall be irrevocably retained by Debtor notwithstanding any federal or state escheat laws to the contrary.

If any Distribution on an Unsecured Claim ("Unsecured Distribution") is tendered by Debtor to a Holder of an Unsecured Claim and returned, refused or otherwise improperly returned ("Unsecured Distribution Refusal"), Debtor shall not be responsible for making any further Unsecured Distribution on account of such Unsecured Claim.  Accordingly, in the event of an Unsecured Distribution Refusal, Debtor shall be relieved of any obligation to make said payment or Distribution and Debtor is relieved of any obligation to make further payments or Distributions on such Unsecured Claim under the Plan.

If any Distribution on a Secured Claim or Priority Claim ("Secured or Priority Distribution") is tendered by Debtor to a Holder of a Secured Claim or Priority Claim and returned, refused or otherwise improperly returned ("Secured or Priority Distribution Refusal"), the Holder of such Secured Claim or Priority Claim, as applicable, shall be deemed to have waived its right to such tendered payment or Distribution and such tendered payment or Distribution shall be deemed satisfied.  In the event of a Secured or Priority Distribution Refusal, any obligation of Debtor to make any additional or further payment on such Secured Claim or Priority Claim shall be tolled until such time as: (i) notice is provided to Debtor that the Holder of such Secured Claim or Priority Claim seeks to receive payments from Debtor on the Secured or Priority Claim or otherwise seeks to enforce Debtor's obligations under the Plan or otherwise enforce the Secured Claim or Priority Claim and (ii) any dispute regarding the Secured or Priority Distribution Refusal and its implications is resolved by agreement of the parties or the Bankruptcy Court (the "Tolling Period"). Only in the event of such notice to Debtor shall Debtor's obligations to perform as to the applicable Secured Claim or Priority Claim resume. The Tolling Period shall: (i) extend the term of the payments on such Secured Claim or Priority Claim and (ii) bar any interest from accruing on the Secured Claim or Priority Claim until such time as any dispute regarding the Secured or Priority Distribution Refusal shall be resolved by a Final Order of the court. Notwithstanding anything in the Plan or otherwise to the contrary, no provision allowing the imposition of late fees, default interest, late charges, damages, or costs and fees against the Debtor or the Debtor's property shall be applicable during the Tolling Period or any period during which a dispute regarding a Tolling Period is being resolved. For purposes of clarification, Debtor shall not be required to make any lump sum cure of payments or Distributions which would have otherwise come due during the Tolling Period or any period during which a dispute regarding a Tolling Period is

26

unresolved, and Debtor shall recommence Distributions upon the resolution of such on the terms in the Plan as tolled.

8.5     *Distributions to Holders as of the Record Date*.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Record Holder of any Claim. Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  Debtor shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

8.6     *Fractional Dollars*.  Any other provision of this Plan notwithstanding, the Debtor shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, at Debtor's option the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

8.7     *Withholding Taxes*.  Debtor shall make reasonable efforts to comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

**Article 9**
**Procedures for Treating and Resolving Disputed Claims**

9.1     *Objections to Claims*.  Debtor shall be entitled to object to Claims, provided, however, that Debtor shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date, or (ii) that are Allowed by the express terms of this Plan. This Court will retain jurisdiction with respect to any claim disputes pursuant to subsequently filed claim objections or adversary proceedings (collectively, the "Claim Disputes") initiated before or after the entry of the Final Decree.

9.2     *No Distributions Pending Allowance*.  Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

9.3     *Resolution of Claims Objections*.  On and after the Confirmation Date, Debtor shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court.

**Article 10**
**Provision for Assumption of Unexpired**
**Leases and Executory Contracts**

10.1    *Provisions Regarding Executory Contracts.*

Any unexpired leases or executory contracts which are not assumed under the Plan or are the subject of a pending motion to assume as of the Effective Date shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code on the Effective Date.  Under the terms of the Plan, a proof of claim for damages arising from such rejection must be filed in compliance with the Bankruptcy Rules on or before thirty (30) days after the Effective Date.  Any claims which are not timely filed will be disallowed and discharged.  Any Allowed Claim for rejection damages will be treated and paid as a Class 8 General Unsecured Claim. Notwithstanding anything to the contrary stated herein, Debtor will be deemed to have assumed all executory contracts regarding, and to the extent related to, liability and property insurance, including without limitation, claims incurred coverage or similar coverage, real and personal property insurance, vehicle insurance, business liability, and professional liability insurance.

Debtor will assume the executory contracts of Content Creators who are specifically listed in **Exhibit "A"** hereto, and the claim for any Cure Amount is listed on Exhibit A, and shall be treated in accordance with Class 6 of the Plan. All other executory contracts with Content Creators will be deemed rejected. Debtor will assume the executory contract of Shipmonk. Debtor will reject its executory contract with REEP-OFC CORPORATE POINTE CA, LLC and Service MVP as well as its executory contract with WeWork.

Debtor may reject any Assumed Contract after its assumption in accordance with 11 U.S.C. § 365(g).

**Article 11**
**Effect of Plan on Claims and Interests**

11.1    *Vesting of Debtor's Assets.*    Except as otherwise explicitly provided in the Plan, upon the Court's entry of the Confirmation Order, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in the Plan.  As of the earlier of the Effective Date and the entry of a Final Decree, Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. 11 U.S.C. §1141(b) provides that the confirmation of the plan vests all property of the estate in the debtor.  11 U.S.C. §1186 discusses post-petition property in the event of confirmation under 11 U.S.C. 1191(b), but it does not alter §1141(b)'s vesting provisions. Therefore, the vesting of Debtor's assets as set forth herein is appropriate whether Debtor's Plan is confirmed as a subchapter V bankruptcy case or not and whether it is confirmed as a "consensual plan" under § 1191(a) or a "cramdown plan" under § 1192(b).

28

11.2    *Discharge of Debtor.*

11.2.1    Discharge if Plan Confirmed Under Section 1129 or Section 1191(a).  In the event the Plan is confirmed under Section 1129 or Section 1191(a), the Debtor shall receive a discharge as provided for under Section 1141(d) upon the Confirmation Date. Without limitation of such discharge but in addition thereto, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

11.2.2    Discharge if Plan Confirmed Under Section 1191(b). If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of the payment of all payments expressly provided for under this Plan due within five (5) years of the Effective Date, the Court shall grant Debtor a discharge. The Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

11.3    *Setoffs*. Debtor may, but shall not be required to, offset, set off or recoup against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that Debtor may have now or in the future against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtor of any such claim that Debtor may have against such Holder.

11.4    Reserved.

11.5    *Injunction*.    The Confirmation Order shall act as a permanent injunction against any Person: (a) commencing or continuing any action, (b) employing any process, or (c) any acting to collect, offset, or recover any Claim except as provided for in this Plan against: (1) Debtor, or (2) against any property of Debtor. Such injunction shall survive the closure of the Bankruptcy Case and this Court shall retain jurisdiction to enforce such injunction.

11.6    *Effect of Confirmation.*

11.6.1    Binding Effect.  On the Confirmation Date, the provisions of this Plan shall be binding on Debtor, the Estate, all Holders of Claims against or Interests in Debtor, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan. Creditors shall have no right to enforce a Claim against Debtor, even following a default under the Plan, except to the extent and amount that any Claim of such creditor is provided for and then due under the Plan.

11.6.2    Filing of Reports.  Debtor shall file all reports required by the Bankruptcy Code and Bankruptcy Rules.

11.6.3  <u>Post-Effective Date Retention of Professionals</u>.  Upon the Effective Date, any requirement that professionals comply with §§ 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and Debtor will employ and pay professionals in their ordinary course of business provided all such requirements for Court approval of fees will continue to apply to the Subchapter V Trustee.

**Article 12**

12.1    Reserved.

**Article 13**
**Retention and Scope of Jurisdiction of the Bankruptcy Court**

13.1    *Retention of Jurisdiction*.  Subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

13.1.1  To adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established herein;

13.1.2  To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated Claim;

13.1.3  To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease of Debtor;

13.1.4  To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by Debtor[2];

13.1.5  To hear and rule upon all applications for Professional Compensation, including the Subchapter V Trustee;

13.1.6  To remedy any defect or omission or reconcile any inconsistency in this Plan, as may be necessary to carry out the intent and purpose of this Plan;

13.1.7  To construe or interpret any provisions in this Plan and to issue such orders as may be necessary for the implementation, execution and consummation of this Plan, to the extent authorized by the Bankruptcy Court;

---

[2] Notwithstanding anything to the contrary in the Plan, Debtor shall be authorized to file any Retained Action related to the collection of accounts receivable or otherwise in any state or local court with jurisdiction under applicable state law.

13.1.8  To adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

13.1.9  To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estate and the payment of claims;

13.1.10 To determine any suit or proceeding brought by Debtor to recover property under any provisions of the Bankruptcy Code;

13.1.11 To hear and determine any tax disputes concerning Debtor and to determine and declare any tax effects under this Plan;

13.1.12 To determine such other matters as may be provided for in this Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

13.1.13 To determine any controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

13.1.14 To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of, or in connection with, any agreement pursuant to which Debtor sold any of its assets during the Bankruptcy Case

13.1.15 To enter a final decree;

13.1.16 To enter an order of discharge; and

13.1.17 To enforce and interpret any order or injunctions entered in this Bankruptcy Case.

13.2     *Alternative Jurisdiction*.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter.  If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.  Notwithstanding anything to the contrary herein, Debtor shall be authorized to bring any action related to a lease, contract or account (including any account receivable due to Debtor) to which Debtor is a party in any state or local court having jurisdiction over such action.

13.3     *Final Decree*.  If the Plan is confirmed, the Bankruptcy Court may, upon application of Debtor, at any time after "substantial consummation" of the Plan as defined in section 1101(2) of the Bankruptcy Code, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing this case pursuant to section 350 of the Bankruptcy Code, provided, however, that: (a) Debtor shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy

Court may from time to time reopen the Bankruptcy Case if appropriate under applicable law. Any fee associated with a motion to reopen this Bankruptcy Case (if necessary) may be waived including for purposes of obtaining a discharge, as applicable, upon order of the Court.

## Article 14
## Miscellaneous Provisions

14.1   *Modification of the Plan*.  In the event Debtor is determined eligible for relief as a subchapter V Debtor, Debtor shall be allowed to modify this Plan pursuant to section 1193 of the Bankruptcy Code to the extent applicable law permits.  In the event Debtor is determined to be ineligible for relief as a subchapter V Debtor, then Debtor shall be allowed to modify the Plan pursuant to the provisions of Bankruptcy Code section 1127.

14.2   *Pre-Confirmation Modifications.* Debtor may modify the Plan at any time before the Confirmation Hearing by filing the modification with the Court.

14.3   Reserved.

14.4   Reserved.

14.5   *Force Majeure.* Without limitation of any other provisions of the Plan, the laws of force majeure shall apply to the Plan and Debtor's compliance with the Plan. Any Person with obligation under this Plan will not be required to perform any obligation under this Plan or be liable for damages to any other Person to whom performance is otherwise owed under this Plan so long as the performance or non-performance of the obligation is delayed, caused, or prevented by an act of God or force majeure. An "act of God" or "force majeure" is defined as hurricanes, earthquakes, floods, fire (or any substantial natural event), pandemics, laws, orders of government, and any other cause not reasonably within the control of such Person with obligations under the Plan and which by the exercise of due diligence the non-performing Party is unable in whole or in part to prevent or overcome. All time periods for such performance will be extended for the period that the act of God or force majeure is in place. Debtor further expressly reserves the right to modify this Plan pursuant to Article 14 of the Plan upon the occurrence of an act of God or force majeure. Debtor shall retain the right to reopen this Bankruptcy Case and seek other relief pursuant to 11 U.S.C. § 305(a) for any reason, so long as the Bankruptcy Court finds that such relief is in the interests of creditors and the debtor.

14.6   *Allocation of Plan Distributions Between Principal and Interest*.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

14.7   *Applicable Law*.  Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the

laws of the State of Georgia without regard to application of any principles of law respecting conflicts of law.

14.8   *Preparation of Estate Returns and Resolution of Tax Claims*.  Debtor shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

14.9   *Headings*.  The headings of the Articles and the sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

14.10   *Revocation of Plan*.  Debtor reserves the right, unilaterally and unconditionally, to revoke and/or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation and/or withdrawal this Plan shall be deemed null and void and of no force and effect.

14.11   *No Admissions; Objection to Claims*.  Nothing in this Plan shall be deemed to constitute an admission that any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity or person as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan. The failure of Debtor to object to or examine any Claim for purposes of voting shall not be deemed a waiver of Debtor's rights to object to or reexamine such Claim in whole or in part.

14.12   *No Bar to Suits*.  Except as otherwise provided in Article 11 of this Plan, neither this Plan or confirmation hereof shall operate to bar or estop Debtor from commencing any Cause of Action, or any other legal action against any Holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any document filed by Debtor in connection with this Bankruptcy Case or whether or not any payment was made or is made on account of any Claim. Without limitation, Debtor retains and reserves the right to prosecute Retained Actions.

14.13   *Exhibits/Schedules*.  All exhibits and schedules to this Plan, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

14.14   *Breach of Plan*. In the event of a breach of the Plan, Confirmation Order, or Discharge Order (and the related injunctions for each) by a creditor, holder of a claim, party in interest or other non-debtor party, Debtor shall be entitled to seek to enforce the terms of the same in the Bankruptcy Court, or any court of competent jurisdiction, and any court or tribunal with jurisdiction over the dispute may award Debtor's reasonable attorney fees and costs incurred in seeking compliance with the Plan in accordance with an award of sanctions or pursuant to Georgia law, including without limitation O.C.G.A 13-1-11.

## Article 15
### Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes.  Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only.  No specific tax consequences to any Creditor or Holders of an Interest are represented, implied, or warranted.  Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation. The Debtor assumes no responsibility for the tax effect that consummation of the Plan will have on any given Holder of a Claim or Interest.  Holders of Claims or Interest are strongly urged to consult their own tax advisors covering the federal, state, local and foreign tax consequences of the Plan to their individual situation.

Respectfully submitted this 6th day of November, 2023

**Fanjoy Co.**

*/s/ Christopher Vaccarino*
By: Christopher Vaccarino, CEO

**JONES & WALDEN LLC**

*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
699 Piedmont Ave NE
Atlanta, Georgia 30308
(404) 564-9300
*Attorneys for Debtor in Possession*

**Exhibit "A"**

**Assumed Content Creator Executory Contracts**

**Exhibit "A": Assumed Content Creator Executory Contracts**

| Content Creator | Amount of Claim / Cure Amount |
|:---:|:---:|
| ████████ | $86,000.00 |
| ████████ | $36,343.74 |
| ███ | $24,336.07 |
| ██████ | $15,000.00 |
| ████████ | $16,250.12 |
| ████████ | $15,000.00 |
| ████████ | $12,797.29 |
| █████ | $7,000.00 |
| ████████ | $5,218.35 |
| █████ | $3,593.82 |
| ██████ | $1,503.27 |
| █████ | $0.00 |
| ████ | $0.00 |
| █████ | $0.00 |
| ██ | $0.00 |
| ████ | $0.00 |
| ████████ | $0.00 |
| ███████ | $0.00 |
| █████████ | $0.00 |
| █████ | $0.00 |
| █████ | $0.00 |
| ██████ | $0.00 |
| ██████ | $0.00 |
| ██████ | $0.00 |
| ██████ | $0.00 |
| ██████ | $0.00 |
| **Total:** | **$223,042.66** |

**Exhibit "B"**

**Monthly Budget**

| Fanjoy Cash Flow Budget - Annual | | Sep 23 | Oct 23 | Nov 23 | Dec 23 | Jan 24 | Feb 24 | Mar 24 | Apr 24 | May 24 | Jun 24 | Jul 24 | Aug 24 | Sep 24 | Oct 24 | Nov 24 | Dec 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | via Weekly | via Weekly | via Weekly | via Weekly | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection |
| | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 | Month 16 |
| STARTING CASH | | 225,000 | 163,413 | 140,112 | 534,125 | 532,000 | 411,549 | 358,799 | 356,049 | 353,299 | 311,097 | 268,895 | 286,693 | 304,491 | 302,289 | 300,087 | 469,885 |
| **INFLOWS** | | | | | | | | | | | | | | | | | |
| Net Incoming Receipts (+) | n/a | 150,059 | 209,417 | 933,505 | 600,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 450,000 | 450,000 | 450,000 | 450,000 | 750,000 | 600,000 |
| Other A/R Receipts (+) | n/a | 45,199 | 17,162 | | | | | | | | | | | | | | |
| Paid in Capital / Equity (+) | n/a | | | | | | | | | | | | | | | | |
| **Total Cash IN** | | 195,258 | 226,579 | 933,505 | 600,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 450,000 | 450,000 | 450,000 | 450,000 | 750,000 | 600,000 |
| **OUTFLOWS** | TERMS | | | | | | | | | | | | | | | | |
| **SUPPLIERS & CREATORS** | | | | | | | | | | | | | | | | | |
| Shipping / COGS | Fixed | 94,084 | 89,237 | 304,739 | 363,675 | 122,500 | 122,500 | 122,500 | 122,500 | 122,500 | 122,500 | 157,500 | 157,500 | 157,500 | 157,500 | 262,500 | 210,000 |
| Shopify Platform (website) | No terms | | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Creator Royalties (current) | Net 60 | 27,274 | 19,000 | 30,000 | 30,000 | 186,701 | 120,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 90,000 | 90,000 | 90,000 | 90,000 |
| Creator Royalties (adequate assurance) | No terms | | | 5,000 | 5,000 | | | | | | | | | | | | |
| **OPERATING COSTS** | | | | | | | | | | | | | | | | | |
| Marketing | No terms | | 5,199 | 22,994 | 15,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 15,000 | 15,000 |
| Rent | No terms | 411 | 10,716 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| Software | Fixed | 1,973 | 7,461 | 2,500 | 2,500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Office Supplies | Fixed | | | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Sales Tax | | 10,644 | 86 | 25,000 | 30,000 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 22,500 | 22,500 | 22,500 | 22,500 | 37,500 | 30,000 |
| Bank Fees | Net 30 | 571 | (411) | 600 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Trustee Escrow | No terms | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | | | | | | | | | | | |
| CircleUp Repayment | No terms | | 20,000 | 20,000 | 30,000 | | | | | | | | | | | | |
| Misc / Other | Fixed | 1,537 | | 1,543 | 1,200 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **PAYROLL & CONSULTANTS** | | | | | | | | | | | | | | | | | |
| W2 Payroll + Fees | Fixed | 115,174 | 100,897 | 100,000 | 100,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 |
| Customer Service | Fixed | | | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Legal Fees | Fixed | | | | 3,000 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Bookkeeping Fees | Fixed | | 2,500 | 5,000 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CFO Advisory | Fixed | 4,588 | 4,500 | 7,500 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **UNSECURED CREDITORS** | | | | | | | | | | | | | | | | | |
| Payments to Creditors | | | | | | | | | | | | | | | | | |
| **Total Cash OUT** | | 256,845 | 249,881 | 539,492 | 602,125 | 470,451 | 402,750 | 352,750 | 352,750 | 352,750 | 352,750 | 392,750 | 392,750 | 412,750 | 412,750 | 540,750 | 480,750 |
| | 25% of + Cash Flow | | | | | | | | | | | | | | | | |
| **Net Operating Cash Flow for Period** | | (61,587) | (23,302) | 394,013 | (2,125) | (120,451) | (52,750) | (2,750) | (2,750) | (2,750) | (2,750) | 57,250 | 57,250 | 37,250 | 37,250 | 209,250 | 119,250 |
| **Less Creditor Payments:** | | | | | | | | | | | | | | | | | |
| CircleUp | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 |
| Shipmonk | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 |
| Creator Cure Payments | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 |
| Other Creditors | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **Ending Cash After Creditor Payments** | | 163,413 | 140,112 | 534,125 | 532,000 | 411,549 | 358,799 | 356,049 | 353,299 | 311,097 | 268,895 | 286,693 | 304,491 | 302,289 | 300,087 | 469,885 | 549,682 |

## Fanjoy Cash Flow Budget - Annual

| | Fixed | TERMS | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | Dec 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 | Projection 2025 |
| | | | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
| **STARTING CASH** | | | 549,682 | 430,180 | 340,678 | 296,276 | 251,874 | 207,472 | 163,070 | 182,868 | 202,666 | 201,064 | 199,462 | 390,851 |
| **INFLOWS** | | | | | | | | | | | | | | |
| Net Incoming Receipts (+) | | n/a | 374,500 | 374,500 | 374,500 | 374,500 | 374,500 | 374,500 | 481,500 | 481,500 | 481,500 | 481,500 | 802,500 | 642,000 |
| Other A/R Receipts (+) | | n/a | - | - | - | - | - | - | - | - | - | - | - | - |
| Paid in Capital / Equity (+) | | n/a | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash IN** | | | 374,500 | 374,500 | 374,500 | 374,500 | 374,500 | 374,500 | 481,500 | 481,500 | 481,500 | 481,500 | 802,500 | 642,000 |
| **OUTFLOWS** | | TERMS | | | | | | | | | | | | |
| **SUPPLIERS & CREATORS** | | | | | | | | | | | | | | |
| Shipping / COGS | Fixed | No terms | 131,075 | 131,075 | 131,075 | 131,075 | 131,075 | 131,075 | 168,525 | 168,525 | 168,525 | 168,525 | 280,875 | 224,700 |
| Shopify Platform (website) | | No terms | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Creator Royalties (current) | | Net 60 | 150,000 | 120,000 | 74,900 | 74,900 | 74,900 | 74,900 | 74,900 | 74,900 | 96,300 | 96,300 | 96,300 | 96,300 |
| Creator Royalties (adequate assurance) | | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| **OPERATING COSTS** | | | | | | | | | | | | | | |
| Marketing | | No terms | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 20,000 | 10,000 |
| Rent | Fixed | No terms | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,800 |
| Software | Fixed | No terms | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Office Supplies | Fixed | No terms | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Sales Tax | | Net 30 | 18,725 | 18,725 | 18,725 | 18,725 | 18,725 | 18,725 | 24,075 | 24,075 | 24,075 | 24,075 | 40,125 | 32,100 |
| Bank Fees | Fixed | No terms | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Trustee Escrow | Fixed | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| Circleup Repayment | | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc / Other | Fixed | No terms | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **PAYROLL & CONSULTANTS** | | | | | | | | | | | | | | |
| W2 Payroll + Fees | Fixed | No terms | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 | 121,000 |
| Customer Service | Fixed | No terms | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Legal Fees | Fixed | No terms | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Bookkeeping Fees | Fixed | No terms | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CFO Advisory | Fixed | No terms | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **UNSECURED CREDITORS** | | | | | | | | | | | | | | |
| Payments to Creditors | | 25% of + Cash Flow | | | | | | | | | | | | |
| **Total Cash OUT** | | | 454,550 | 424,550 | 379,450 | 379,450 | 379,450 | 379,450 | 422,250 | 422,250 | 443,650 | 443,650 | 584,050 | 509,850 |
| **Net Operating Cash Flow for Period** | | | (80,050) | (50,050) | (4,950) | (4,950) | (4,950) | (4,950) | 59,250 | 59,250 | 37,850 | 37,850 | 218,450 | 132,150 |
| **Less Creditor Payments:** | | | | | | | | | | | | | | |
| CircleUp | | | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 |
| Shipmonk | | | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 |
| Creator Cure Payments | | | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 12,391.26 | 0.00 |
| Other Creditors | | | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **Ending Cash After Creditor Payments** | | | 430,180 | 340,678 | 296,276 | 251,874 | 207,472 | 163,070 | 182,868 | 202,666 | 201,064 | 199,462 | 390,851 | 495,940 |

## Fanjoy Cash Flow Budget - Annual

| Line Item | TERMS | Jan 26 (Month 29) | Feb 26 (Month 30) | Mar 26 (Month 31) | Apr 26 (Month 32) | May 26 (Month 33) | Jun 26 (Month 34) | Jul 26 (Month 35) | Aug 26 (Month 36) | Sep 26 (Month 37) | Oct 26 (Month 38) | Nov 26 (Month 39) | Dec 26 (Month 40) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STARTING CASH** | | 495,940 | 379,958 | 296,077 | 260,452 | 224,827 | 199,444 | 174,062 | 217,373 | 260,684 | 281,097 | 301,511 | 513,006 |
| **INFLOWS** | | | | | | | | | | | | | |
| Net Incoming Receipts (+) | n/a | 400,715 | 400,715 | 400,715 | 400,715 | 400,715 | 400,715 | 515,205 | 515,205 | 515,205 | 515,205 | 858,675 | 686,940 |
| Other A/R Receipts (+) | n/a | - | - | - | - | - | - | - | - | - | - | - | - |
| Paid in Capital / Equity (+) | n/a | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash IN** | | 400,715 | 400,715 | 400,715 | 400,715 | 400,715 | 400,715 | 515,205 | 515,205 | 515,205 | 515,205 | 858,675 | 686,940 |
| **OUTFLOWS** | | | | | | | | | | | | | |
| **SUPPLIERS & CREATORS** | | | | | | | | | | | | | |
| Shipping / COGS | No terms (Fixed) | 140,250 | 140,250 | 140,250 | 140,250 | 140,250 | 140,250 | 180,322 | 180,322 | 180,322 | 180,322 | 300,536 | 240,429 |
| Shopify Platform (website) | No terms | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Creator Royalties (current) | Net 60 | 160,500 | 128,400 | 80,143 | 80,143 | 80,143 | 80,143 | 80,143 | 80,143 | 103,041 | 103,041 | 103,041 | 103,041 |
| Creator Royalties (adequate assurance) | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| **OPERATING COSTS** | | | | | | | | | | | | | |
| Marketing | No terms | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Rent | No terms (Fixed) | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| Software | No terms (Fixed) | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Office Supplies | No terms (Fixed) | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Sales Tax | Net 30 | 20,036 | 20,036 | 20,036 | 20,036 | 20,036 | 20,036 | 25,760 | 25,760 | 25,760 | 25,760 | 42,934 | 34,347 |
| Bank Fees | No terms (Fixed) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Trustee Escrow | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| CircleJop Repayment | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc / Other | No terms (Fixed) | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **PAYROLL & CONSULTANTS** | | | | | | | | | | | | | |
| W2 Payroll + Fees | No terms (Fixed) | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 | 133,100 |
| Customer Service | No terms (Fixed) | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Legal Fees | No terms (Fixed) | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Bookkeeping Fees | No terms (Fixed) | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CFO Advisory | No terms (Fixed) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **UNSECURED CREDITORS** | | | | | | | | | | | | | |
| Payments to Creditors | 25% of + Cash Flow | | | | | | | | | | | | |
| **Total Cash OUT** | | 489,636 | 457,536 | 409,279 | 409,279 | 409,279 | 409,279 | 455,075 | 455,075 | 477,973 | 477,973 | 630,361 | 546,667 |
| **Net Operating Cash Flow for Period** | | (88,921) | (56,821) | (8,564) | (8,564) | (8,564) | (8,564) | 60,130 | 60,130 | 37,232 | 37,232 | 228,314 | 140,273 |
| **Less Creditor Payments:** | | | | | | | | | | | | | |
| CircleUp | | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 |
| Shipmonk | | 10,242.06 | 10,242.06 | 10,242.06 | 10,242.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Creator Cure Payments | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Creditors | | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **Ending Cash After Creditor Payments** | | 379,958 | 296,077 | 260,452 | 224,827 | 199,444 | 174,062 | 217,373 | 260,684 | 281,097 | 301,511 | 513,006 | 636,460 |

## Fanjoy Cash Flow Budget - Annual

| | Fixed | TERMS | Jan 27 | Feb 27 | Mar 27 | Apr 27 | May 27 | Jun 27 | Jul 27 | Aug 27 | Sep 27 | Oct 27 | Nov 27 | Dec 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 | Projection 2027 |
| | | | Month 41 | Month 42 | Month 43 | Month 44 | Month 45 | Month 46 | Month 47 | Month 48 | Month 49 | Month 50 | Month 51 | Month 52 |
| **STARTING CASH** | | | 636,460 | 516,005 | 429,898 | 395,425 | 360,952 | 326,480 | 292,007 | 331,037 | 370,067 | 384,596 | 399,125 | 626,161 |
| **INFLOWS** | | | | | | | | | | | | | | |
| Net Incoming Receipts (+) | | n/a | 428,765 | 428,765 | 428,765 | 428,765 | 428,765 | 428,765 | 551,269 | 551,269 | 551,269 | 551,269 | 918,782 | 735,026 |
| Other A/R Receipts (+) | | n/a | - | - | - | - | - | - | - | - | - | - | - | - |
| Paid in Capital / Equity (+) | | n/a | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash IN** | | | 428,765 | 428,765 | 428,765 | 428,765 | 428,765 | 428,765 | 551,269 | 551,269 | 551,269 | 551,269 | 918,782 | 735,026 |
| **OUTFLOWS** | | | | | | | | | | | | | | |
| **SUPPLIERS & CREATORS** | | | | | | | | | | | | | | |
| Shipping / COGS | | No terms | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 | 150,068 |
| Shopify Platform (website) | | No terms | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Creator Royalties (current) | Fixed | Net 60 | 171,735 | 137,388 | 85,753 | 85,753 | 85,753 | 85,753 | 85,753 | 85,753 | 110,254 | 110,254 | 110,254 | 110,254 |
| Creator Royalties (adequate assurance) | | No terms | | | | | | | | | | | | |
| **OPERATING COSTS** | | | | | | | | | | | | | | |
| Marketing | | No terms | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 15,000 | 15,000 |
| Rent | Fixed | No terms | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| Software | Fixed | No terms | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Office Supplies | Fixed | No terms | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Sales Tax | | Net 30 | 21,438 | 21,438 | 21,438 | 21,438 | 21,438 | 21,438 | 27,563 | 27,563 | 27,563 | 27,563 | 45,939 | 36,751 |
| Bank Fees | Fixed | No terms | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Trustee Escrow | Fixed | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| CircleJp Repayment | | No terms | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc / Other | Fixed | No terms | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **PAYROLL & CONSULTANTS** | | | | | | | | | | | | | | |
| W2 Payroll + Fees | Fixed | No terms | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 | 146,410 |
| Customer Service | Fixed | No terms | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Legal Fees | Fixed | No terms | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Bookkeeping Fees | Fixed | No terms | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CFO Advisory | Fixed | No terms | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **UNSECURED CREDITORS** | | | | | | | | | | | | | | |
| Payments to Creditors | | 25% of + Cash Flow | | | | | | | | | | | | |
| **Total Cash OUT** | | | 522,401 | 488,054 | 436,419 | 436,419 | 436,419 | 436,419 | 485,421 | 485,421 | 509,922 | 509,922 | 664,927 | 591,424 |
| **Net Operating Cash Flow for Period** | | | (93,636) | (59,289) | (7,654) | (7,654) | (7,654) | (7,654) | 65,849 | 65,849 | 41,348 | 41,348 | 253,855 | 143,601 |
| **Less Creditor Payments:** | | | | | | | | | | | | | | |
| CircleUp | | | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 |
| Shipmonk | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Creator Cure Payments | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Creditors | | | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| **Ending Cash After Creditor Payments** | | | 516,005 | 429,898 | 395,425 | 360,952 | 326,480 | 292,007 | 331,037 | 370,067 | 384,596 | 399,125 | 626,161 | 742,944 |

| Fanjoy Cash Flow Budget - Annual | TERMS | | Jan 28 Month 53 | Feb 28 Month 54 | Mar 28 Month 55 | Apr 28 Month 56 | May 28 Month 57 | Jun 28 Month 58 | Jul 28 Month 59 | Aug 28 Month 60 | Sep 28 Month 61 | Oct 28 Month 62 | Nov 28 Month 63 | Dec 28 Month 64 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STARTING CASH** | | | 742,944 | 603,835 | 501,477 | 454,369 | 407,261 | 360,153 | 313,044 | 344,584 | 376,123 | 381,447 | 386,770 | 620,037 |
| **INFLOWS** | | | | | | | | | | | | | | |
| Net Incoming Receipts (+) | n/a | | 458,779 | 458,779 | 458,779 | 458,779 | 458,779 | 458,779 | 589,858 | 589,858 | 589,858 | 589,858 | 983,097 | 786,478 |
| Other A/R Receipts (+) | n/a | | - | - | - | - | - | - | - | - | - | - | - | - |
| Paid in Capital / Equity (+) | n/a | | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash IN** | | | 458,779 | 458,779 | 458,779 | 458,779 | 458,779 | 458,779 | 589,858 | 589,858 | 589,858 | 589,858 | 983,097 | 786,478 |
| **OUTFLOWS** | | | | | | | | | | | | | | |
| **SUPPLIERS & CREATORS** | | | | | | | | | | | | | | |
| Shipping / COGS | No terms | | 160,573 | 160,573 | 160,573 | 160,573 | 160,573 | 160,573 | 206,450 | 206,450 | 206,450 | 206,450 | 344,084 | 275,267 |
| Shopify Platform (website) | No terms | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Creator Royalties (current) | Net 60 | Fixed | 183,756 | 147,005 | 91,756 | 91,756 | 91,756 | 91,756 | 91,756 | 91,756 | 117,972 | 117,972 | 117,972 | 117,822 |
| Creator Royalties (adequate assurance) | No terms | | - | - | - | - | - | - | - | - | - | - | - | - |
| **OPERATING COSTS** | | | | | | | | | | | | | | |
| Marketing | No terms | | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 15,000 | 15,000 |
| Rent | No terms | Fixed | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| Software | No terms | Fixed | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Office Supplies | No terms | Fixed | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Sales Tax | Net 30 | | 22,939 | 22,939 | 22,939 | 22,939 | 22,939 | 22,939 | 29,493 | 29,493 | 29,493 | 29,493 | 49,155 | 39,324 |
| Bank Fees | No terms | Fixed | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | - |
| Trustee Escrow | No terms | | - | - | - | - | - | - | - | - | - | - | - | - |
| CircleJp Repayment | | | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc / Other | No terms | Fixed | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **PAYROLL & CONSULTANTS** | | | | | | | | | | | | | | |
| W2 Payroll + Fees | No terms | Fixed | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 | 161,051 |
| Customer Service | No terms | Fixed | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Legal Fees | No terms | Fixed | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Bookkeeping Fees | No terms | Fixed | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CFO Advisory | No terms | Fixed | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **UNSECURED CREDITORS** | | | | | | | | | | | | | | |
| Payments to Creditors | 25% of + Cash Flow | | | | | | | | | | | | | |
| **Total Cash OUT** | | | 561,069 | 524,318 | 469,068 | 469,068 | 469,068 | 469,068 | 521,500 | 521,500 | 547,716 | 547,716 | 713,011 | 634,364 |
| **Net Operating Cash Flow for Period** | | | (102,290) | (65,539) | (10,290) | (10,290) | (10,290) | (10,290) | 68,358 | 68,358 | 42,142 | 42,142 | 270,086 | 152,114 |
| **Less Creditor Payments:** | | | | | | | | | | | | | | |
| CircleUp | | | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 | 11,818.74 |
| Shipmonk | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Creator Cure Payments | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Creditors | | | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| **Ending Cash After Creditor Payments** | | | 603,835 | 501,477 | 454,369 | 454,369 | 407,261 | 360,153 | 313,044 | 344,584 | 376,123 | 381,447 | 620,037 | 735,332 |

## CERTIFICATE OF SERVICE

I certify that on the date specified herein below I cause to be served a copy of the foregoing documents via first class United States mail in a properly addressed envelope with sufficient postage affixed thereto to ensure delivery upon the parties listed below:

Office of the United States Trustee
362 Richard B. Russell Federal Bldg.
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

This 6th day of November, 2023.

**JONES & WALDEN LLC**

*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
Attorney for Debtor
699 Piedmont Ave NE
Atlanta, Georgia 30308
(404) 564-9300
lpineyro@joneswalden.com